IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-44

No. 24A20

Filed 23 April 2021

IN THE MATTER OF: A.W.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from orders entered on 19 November 2019 by Judge Benjamin S. Hunter in District Court, Franklin County. This matter was calendared for argument in the Supreme Court on 19 March 2021 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Gena Walling McCray for petitioner-appellee Franklin County Department of Social Services.*

*Matthew D. Wunsche for appellee Guardian ad Litem.*

*Anné C. Wright for respondent-appellant mother.*

BERGER, Justice.

¶ 1  Respondent-mother appeals from the trial court's order adjudicating her child A.W. (Abigail)[1] a neglected and dependent juvenile and the trial court's order terminating her parental rights in Abigail based on neglect and dependency. After careful review, we affirm the trial court's orders.

**Background**

---

[1] Pseudonyms are used to protect the identities of the juveniles and for ease of reading.

In January 2017, A.M.W. (Anna)[2] was born to respondents. In March 2017, the Franklin County Department of Social Services (DSS) received a Child Protective Services (CPS) report that Anna was admitted to the emergency room on 11 March 2017 with significant, unexplained injuries. Anna suffered a severe traumatic brain injury, "bleeding around the brain, subdural hemorrhages, as well as some other fluid collections which [were] indicative of old hematomas[.]" In addition, she had fractured ribs in various stages of healing, a ruptured spleen, internal bleeding, and a fracture in one of her legs. Neither respondent provided an explanation that could account for Anna's injuries. On 15 March 2017, Anna died as a result of blunt force injuries to her head. Her autopsy ruled her death a homicide.

Dr. Benjamin Alexander, an expert in pediatrics and pediatric abuse, treated Anna prior to her death and concluded as follows:

> The pattern and nature of this unfortunate infant's injuries are characteristic of those seen in young infants who are abused by adult caregivers. Injuries this severe are due to very high forces such as might typically be seen in a high-velocity motor vehicle accident, or a fall from a second story window. This assortment of injuries does not occur due to any disease or condition—they are obviously traumatic. Without any history of trauma offered, it must be concluded that this child was abused by an adult who is concealing the truth.
>
> The pattern of lateral rib fractures in conjunction with subdural hematomas is typically seen in infants who have been grasped around the chest and violently shaken. In

---

[2] Anna is not a subject of this appeal.

addition, the bilateral skull fractures indicate that the infant's head was smashed against a hard object.

Rupture of the spleen, in the absence of rare infections or malignancy (which this child does not have), is due to a traumatic cause. The infant was most likely struck forcefully in the upper abdomen or back to cause this injury.

The metaphyseal fracture seen in the distal tibia is typically associated with a forceful, violent twisting force applied to the foot or lower leg.

Because the rib fractures and distal tibia fracture demonstrate some early evidence of healing, which is not normally seen before seven days after an injury and therefore before the onset of neurologic symptoms associated with the current head injury, I believe this child was abused on multiple occasions. Also the presence of low-density fluid collections, as would be seen with resorbing blood, may also be an indicator of multiple episodes of shaking.

¶ 4    In March 2018, Abigail was born to respondents. On 16 March 2018, DSS obtained nonsecure custody of Abigail and filed a petition alleging her to be a neglected and dependent juvenile. The petition alleged that Abigail was a neglected juvenile in that her sibling, Anna, died in the care of respondents as a result of suspected abuse and neglect. Respondents reported they were the only caregivers and gave no explanation for Anna's injuries. Respondent-father was incarcerated on charges related to Anna's death, and respondent-mother's involvement in Anna's death had not been ruled out. Because of the nature of Anna's injuries and death, Abigail was at substantial risk of abuse and neglect if she remained in respondents'

care and supervision. The petition also alleged that respondents were unable to provide for Abigail's care or supervision because of the aforementioned neglect and lacked an appropriate alternative childcare arrangement. DSS later amended the petition to add allegations that after Anna's death, respondent-father reported that the family dog had caused Anna's injuries. However, respondent-father's account did not explain Anna's injuries. In addition, respondent-mother remained in a relationship with respondent-father after Anna's death, became pregnant with Abigail, and regularly visited respondent-father in jail.

¶ 5          On 29 August 2018, DSS filed a motion to terminate respondent-mother's parental rights in Abigail. DSS alleged that respondent-mother had neglected Abigail, and there was no indication that she was willing or able to correct the conditions that lead to Anna's death and the injurious environment that was present in her home, *see* N.C.G.S. § 7B-1111(a)(1) (2019), and respondent-mother was incapable of providing for the proper care and supervision of Abigail such that Abigail was a dependent juvenile, *see* N.C.G.S. § 7B-1111(a)(6) (2019).

¶ 6          Both the juvenile petition and motion to terminate respondent-mother's parental rights in Abigail came on for hearing eight times between January and August 2019. On 19 November 2019, the trial court entered orders concluding that Abigail was a neglected and dependent juvenile and finding that any efforts toward reunification with respondent-mother would be unsuccessful and contrary to Abigail's

health, safety, and need for a permanent home within a reasonable period of time. The trial court ordered that Abigail remain in the custody of DSS and set the primary permanent plan as adoption with a secondary plan of custody with a court approved caretaker. Also, on 19 November 2019, the trial court entered a separate order concluding that grounds existed to terminate respondent-mother's parental rights in Abigail pursuant to N.C.G.S. § 7B-1111(a)(1) and (6). The trial court determined that it was in Abigail's best interests that respondent-mother's parental rights be terminated, and the court terminated her parental rights. *See* N.C.G.S. § 7B-1110(a) (2019).

On 13 December 2019, respondent-mother entered notice of appeal to the Court of Appeals of North Carolina from the 19 November 2019 adjudication and disposition orders and to this Court from the 19 November 2019 order terminating her parental rights. On 12 March 2020, respondent-mother filed a motion in this Court for consolidation of the actions on appeal and, alternatively, a petition for discretionary review of the adjudication and disposition orders. By order entered 18 March 2020, this Court allowed the motion for consolidation of the actions on appeal and dismissed as moot the petition for discretionary review.

**Analysis**

On appeal, respondent-mother argues the trial court erred in adjudicating Abigail a neglected and dependent juvenile. She also argues that the trial court erred

in ceasing reunification efforts and failing to make reunification part of Abigail's permanent plan. Respondent-mother further contends that the trial court erred by adjudicating grounds for termination of her parental rights based on neglect and dependency. We address each argument in turn.

## I. Adjudication of Neglect and Dependency

### Standard of Review

We review a district court's adjudication under N.C.G.S. § 7B-1111(a) to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law. Unchallenged findings of fact are deemed supported by competent evidence and are binding on appeal. Moreover, we review only those findings needed to sustain the trial court's adjudication. The issue of whether a trial court's findings of fact support its conclusions of law is reviewed de novo. However, an adjudication of any single ground for terminating a parent's rights under N.C.G.S. § 7B-1111(a) will suffice to support a termination order.

*In re J.S.*, 374 N.C. 811, 814–15, 845 S.E.2d 66, 70–71 (2020) (cleaned up).

### Adjudication of Neglect

A "neglected juvenile" is defined, in pertinent part, as a child

whose parent, guardian, custodian, or caretaker does not provide proper care, supervision, or discipline; . . . or who lives in an environment injurious to the juvenile's welfare[.] . . . In determining whether a juvenile is a neglected juvenile, it is relevant whether that juvenile lives in a home where another juvenile has died as a result of suspected abuse or neglect[.]

N.C.G.S. § 7B-101(15) (2019). "In order to adjudicate a juvenile neglected, our courts have additionally required that there be some physical, mental, or emotional impairment of the juvenile or a *substantial risk of such impairment* as a consequence of the failure to provide proper care, supervision, or discipline." *In re Stumbo*, 357 N.C. 279, 283, 582 S.E.2d 255, 258 (2003) (cleaned up) (emphasis added).

¶ 11        Respondent-mother challenges several findings of fact as not being supported by the evidence. Respondent-mother contests the following portions of the trial court's findings 17, 24, 28, 30, 34, and 36, which provide that she and respondent-father worked together to develop an explanation for Anna's injuries:

> 17. On May 24, 2017, the respondent[s] offered to law enforcement an explanation of [Anna's] injuries that defies all medical evidence, and it is clear to the Court that the *respondents worked together to develop the explanation.* Through video-taped statements and reenactments, the respondent[s] indicated that [Anna's] head injuries were caused when the parents' dog, a large Great Dane, jumped on the respondent-father's arm while he was holding [Anna], causing him to lose his grip on [Anna]. [Anna] started to fall, and although [respondent-father] caught her before he fully dropped her, [Anna's] head hit the tiled floor in the kitchen. *[Respondents] both stated that the mother was asleep in the next room when this incident occurred.*
>
> . . . .
>
> 24. During this trial, all three experts, including the respondent-mother's expert, Dr. Owens, reviewed the reenactments and statements the parents provided to law enforcement and the Department, and each confidently concluded that the injuries that [Anna] sustained to her

head could not have been caused by *the event described by the parents.* Each also confidently concluded that there were still no explanations given for the leg fracture and the left rib fractures showing signs of healing. All three experts agreed that the skull fractures were similar to what you might see from a severe automobile accident, a drop from a second-story window or by something broad hitting or crushing the baby's skull. The parents presented no evidence that offered a plausible explanation for the severe head injuries. The parents presented no evidence that offered any explanations for the injuries to the left ribs and the leg which occurred 7 to 14 days before the head injuries. Dr. Alexander and Dr. Douglas ruled out any medical condition which would have accounted for the broken bones. There was no evidence presented on medical conditions that might account for the broken bones.

. . . .

28. [Respondent-mother] presented evidence on July 10, 2019 of the hardness of the floor, pictures of the size of the Great Dane compared to [the] size of [respondent-father], and [respondent-mother] brought the dog to Court as evidence of the dog's size and disposition. *[Respondent-mother], throughout this trial, presented evidence that [Anna] died because of the dog.*

. . . .

30. No explanation by either parent accounts for the multiple injuries over time or the injuries that caused [Anna]'s death. [Anna]'s death was caused by an act of one or both of the respondents. From March 11, 2017 to May 24, 2017, the parents provided no explanation of what happened to [Anna]. When the parents presented an explanation on May 24, 2017, it defied all medical evidence and it defied all reason. *It is clear that the parents were coordinating their statements.* In March 2018, the father altered his explanation in ways that he thought would conform to the child's injuries, but it did not explain the injuries. The parents' have remained unified in their

stance that their dog caused the head injury, and they still have not provided an explanation for the other injuries. *The parents have been consistently unified in not revealing to law enforcement, [DSS], or this Court, what happened to [Anna].*

. . . .

34. There are other indications, in addition to [Anna]'s death, that the environment is injurious. The mother admitted taking Concerta and other prescription drugs that were not prescribed to her, and neither the mother, nor the mother's close friend, believe that this was concerning or inappropriate. The mother admitted allowing a heroin addict to live with her while [respondent-father] was incarcerated, and indicated that if he died of an [overdose] while in her home, she would conceal the body from law enforcement. The father indicated in conversations with the mother that he was acquainted with heroin use. *The mother and father showed a willingness and plan to deceive authorities in these proceedings.*

. . . .

36. Based upon the foregoing, aggravating factors exist that prevent reunification with either parent in this matter in that the juvenile's sibling died in the home due to abuse, and *the mother and father have consistently worked together to conceal what happened to [Anna].* This conduct increases the enormity and adds to the consequences of the neglect of [Abigail] because there is no means by which this Court can address what caused the death of [Anna] and thereby [e]nsure the safety of [Abigail].

Specifically, respondent-mother asserts that she did not and could not have offered an explanation of the events causing Anna's injuries because she was asleep in another room at the time Anna was injured.

¶ 12     The foregoing portions of the challenged findings are supported by clear and convincing evidence in the record. In a 14 March 2017 interview with law enforcement, respondent-mother recounted her suggestion to a doctor who treated Anna that Anna's injuries could have been caused by respondents' large dog, a Great Dane. At the adjudicatory hearing, respondent-mother rejected the medical examiner's conclusion in Anna's autopsy report that her death was a homicide. She testified that she personally believed that respondent-father "was holding her wrong, and getting the bottle made, and he wasn't holding her right, and holding her with his one arm, and she slipped out of his arms. That's what I think." Furthermore, she introduced a video of the tile floor in her house where Anna's injuries allegedly occurred to demonstrate that it was "hard as a rock" and brought her Great Dane to the courthouse to demonstrate its size and that "accidents can happen." This evidence provides ample support for the trial court's determination that respondent-mother offered an explanation, one involving respondents' Great Dane, for the source of Anna's injuries. *See In re D.L.W.*, 368 N.C. 835, 843, 788 S.E.2d 162, 167–68 (2016) (stating that it is the trial judge's duty to consider all the evidence, pass upon the

credibility of the witnesses, and determine the reasonable inferences to be drawn therefrom).

¶ 13    In addition, the trial court's findings that respondents coordinated their stories with one another in an attempt to conceal what really caused Anna's injuries is supported by the evidence. During respondent-mother's 14 March 2017 interview with law enforcement, she reported that after a doctor detailed the extent of Anna's numerous injuries, she spoke with respondent-father:

> And I'm like well how did it happen? And he's like I don't know. I'm like can it be from our dog, you know. Like we have – we have some dogs and our biggest dog's a Great Dane and he's jumped on – jumped on the bed and has cracked me in my nose to where I'd be screaming for [respondent-father] to come in. And one time I wound up bleeding but he never broke my nose.

Considering respondents' conversation, in light of the unchallenged findings that Anna was severely abused while she resided in respondents' care and Dr. Alexander's conclusion that Anna was abused by an "adult who is concealing the truth," the trial court made the reasonable inference that respondents worked together to develop an explanation for Anna's injuries in an attempt to conceal the truth.

¶ 14    Respondent-mother also contests the portion of finding of fact 27, which provides that "[t]he conversation between [respondents] in December 2018 showed an intent to collude to deceive this Court about their relationship and that they were coordinating their testimony for Court." She argues that there is no evidence that she

was conspiring with respondent-father to provide false testimony. The record demonstrates otherwise. In a December 2018 conversation between respondents, respondent-mother informed respondent-father that she was "going to take off my ring for the trial" and explain that they are taking a "break to, you know, think about things and stuff[,]" and respondent-father accepted her plan. Yet, at the time of the termination hearing, respondent-mother admitted that respondents continued to be in a relationship. Thus, the challenged portion of the trial court's finding of fact 27 is supported by clear and convincing evidence.

¶ 15    Respondent-mother argues that the trial court's finding of fact 31, which provides that Abigail was "born into the same injurious environment that resulted in [Anna]'s death[,]" is not supported by clear and convincing evidence. Yet, the trial court's unchallenged findings that no explanation by either parent accounted for Anna's injuries, Anna's death was caused by an act by one or both respondents, respondents were still together and planned to remain together, and Abigail's proposed caregivers would not protect her or follow a safety plan for Abigail support the trial court's finding that Abigail was born into the same injurious environment as Anna.

¶ 16    Respondent-mother challenges the portions of finding of fact 34 in which the trial court found that there were other factors besides Anna's death that indicated the existence of an injurious environment, namely respondent-mother's use of non-

prescribed drugs, and allowing a heroin addict to live in the home while respondent-father was incarcerated. Respondent-mother contends that she only took Concerta twice to help her study and that she had only taken Gabapentin twice. She argues that there was no evidence that she was caring for Anna or Abigail at the times when she took these drugs and that her use of these drugs was not sufficient in and of itself to support an adjudication of neglect. She also argues that allowing a friend of respondent-father to live with her for a month does not show that her home was an injurious environment for Abigail. Because, as we detail below, the contested portions of finding of fact 34 relating to respondent-mother's drug use and allowing a heroin addict to live in her home are not necessary to support the trial court's adjudication of neglect, we decline to review respondent-mother's challenges. *In re T.N.H.*, 372 N.C. 403, 407, 831 S.E.2d 54, 58–59 (2019) ("[W]e review only those findings necessary to support the trial court's determination that grounds existed to terminate respondent's parental rights." (citing *In re Moore*, 306 N.C. 394, 404, 293 S.E.2d 132, 133 (1982)).

¶ 17 Next, respondent-mother argues that the trial court's findings of fact do not support its adjudication that Abigail was a neglected juvenile. She contends that Abigail was not at substantial risk of impairment living in a home with respondent-mother. We are not convinced.

¶ 18 This Court has held that

> [a] court may not adjudicate a juvenile neglected solely
> based upon previous [DSS] involvement relating to other
> children. Rather, in concluding that a juvenile "lives in an
> environment injurious to the juvenile's welfare," N.C.G.S.
> § 7B-101(15), the clear and convincing evidence in the
> record must show current circumstances that present a
> risk to the juvenile.

*In re J.A.M.*, 372 N.C. 1, 9, 822 S.E.2d 693, 698 (2019). "In neglect cases involving newborns, 'the decision of the trial court must of necessity be predictive in nature, as the trial court must assess whether there is a substantial risk of future abuse or neglect of a child based on the historical facts of the case.' " *Id.* at 9, 822 S.E.2d at 698–99 (citation omitted).

Here, although the trial court considered the fact that Abigail lived in the same home where Anna died as a result of an act of one or both respondents, this was not the sole basis for the trial court's conclusion that Abigail was a neglected juvenile. Rather, the trial court also found the presence of other factors demonstrating that Abigail presently faced a substantial risk in her living environment: respondent-mother continued to provide the implausible explanation that her dog caused Anna's head injury; respondent-mother failed to provide an explanation that accounted for Anna's other injuries; there were no means by which the court could determine what caused Anna's death and "thereby insure the safety of [Abigail]"; respondent-mother continued to be in a relationship with respondent-father; and respondents colluded to deceive the court about the status of their relationship. In conjunction with the fact

that Anna died in the home at the hands of one or both respondents, the findings of respondent-mother's ongoing failure to recognize and accept the cause of Anna's injuries and resulting death, and her continued relationship with respondent-father, establish that respondent-mother was unable to ensure Abigail's safety and that Abigail was at a substantial risk of impairment. Respondent-mother did not remedy the injurious environment that existed for Anna, and the trial court properly concluded that Abigail was a neglected juvenile.

### Adjudication of Dependency

¶ 20 A "dependent juvenile" is defined as a juvenile "in need of assistance or placement because (i) the juvenile has no parent, guardian, or custodian responsible for the juvenile's care or supervision or (ii) the juvenile's parent, guardian, or custodian is unable to provide for the juvenile's care or supervision and lacks an appropriate alternative child care arrangement." N.C.G.S. § 7B-101(9) (2019). "In determining whether a juvenile is dependent, 'the trial court must address both (1) the parent's ability to provide care or supervision, and (2) the availability to the parent of alternative child care arrangements.' " *In re K.D.C.*, 375 N.C. 784, 795, 850 S.E.2d 911, 920 (2020) (quoting *In re B.M.*, 183 N.C. App. 84, 90, 643 S.E.2d 644, 648 (2007)).

¶ 21 First, respondent-mother challenges the portion of finding of fact 24, which states that "all three experts, including the respondent-mother's expert, Dr. Owens,

reviewed the reenactments and statements the parents provided to law enforcement and [DSS], and each confidently concluded that the injuries that [Anna] sustained to her head could not have been caused by the events described by [respondents]." She argues that Dr. Owens testified that while the explanation provided by respondent-father was unlikely to have caused Anna's injuries, it was not impossible. Dr. Owens, a forensic pathologist initially testified that the explanation that respondents' dog jumped on respondent-father and caused Anna's head to hit the floor was "not likely" to explain the fractures to Anna's head. However, Dr. Owens subsequently explained that the force of Anna's head hitting the floor while respondent-father was holding her did not explain the head fractures she sustained. Dr. Owens also testified that "[i]t would require a more accelerated force or a fall from a greater height[.]" Thus, the trial court's finding of fact 24 is supported by the evidence. *See In re B.O.A.*, 372 N.C. 372, 379, 831 S.E.2d 305, 310 (2019) (stating that "[a] trial court's finding of fact that is supported by clear, cogent, and convincing evidence is deemed conclusive even if the record contains evidence that would support a contrary finding.").

¶ 22    Respondent-mother also contends that finding of fact 33 is not supported by the evidence. This finding provides as follows:

> 33. Despite the clear medical evidence presented that [Anna] died of non-accidental means and that no explanation given by either parent matches the injuries, all potential caregivers identified by the parents assert that [Anna] died by accidental means. Not one of them believed that [Anna] was abused. Each family member and friend

> believed and testified that [Anna] died from an accident, even after being presented with clear and convincing medical evidence that contradicted their belief. One caregiver summarized the overall attitude of all of the parents' family and friends when he said, "If [respondent-mother] said it, I believe it." Based upon their testimonies, it is clear that the proposed caregivers would not protect [Abigail] and would not follow a safety plan for [Abigail.]"

¶ 23    Four individuals, including Abigail's paternal uncle and three of respondents' friends, testified during the adjudicatory phase of the hearing. The paternal uncle testified that he did not believe respondent-father "murder[ed Anna] intentionally." Two of respondents' friends testified that they believed Anna's injuries were accidental. A fourth individual testified that she believed respondents' explanation of the cause of Anna's injuries "could have been true" and "the story kind of made sense." Because none of these individuals believed Anna had been abused, the trial court reasonably inferred that they would not follow a safety plan for Abigail. Accordingly, the trial court's finding of fact 33 is supported by the evidence.

¶ 24    Respondent-mother also challenges that the following portion of the trial court's finding of fact 35: "There is no protective parent and no protective relative or kinship provider that could provide a safe home for [Abigail]." Specifically, respondent-mother argues that any of the potential placements would provide a home where respondent-father would not be present. This argument, however, disregards an important aspect of why the trial court reasoned no protective relative or kinship provider could provide a safe home for Abigail – the fact that no potential caregivers

identified by respondents believed that Anna had been abused. The trial court reasonably inferred from the evidence that the potential caregivers' failure to acknowledge the intentional nature of Anna's injuries and death would impede their ability to provide a safe environment for Abigail.

¶ 25        Next, respondent-mother argues that the trial court erred by adjudicating Abigail a dependent juvenile because she was able to care for Abigail herself, and alternatively, if respondent-mother could not provide care, Abigail was not dependent because she provided appropriate alternative child care options. Her arguments are unpersuasive.

¶ 26        Here, the trial court reasonably found that respondent-mother was unable to properly care for and supervise Abigail because Anna died in the home due to abuse, and respondents worked together to conceal what happened to Anna. Thus, there was "no means by which this Court can address what caused the death of [Anna] and thereby [e]nsure the safety of [Abigail]." Moreover, respondent-mother planned to remain in a romantic relationship with respondent-father while he was in jail on charges related to Anna's death. As previously discussed, the trial court also made findings, which were supported by the evidence or reasonable inferences drawn from the evidence, that the potential caregivers respondents offered were inappropriate because none of them believed that Anna was abused, that they would not protect

Abigail, and that they would not follow a safety plan for Abigail. These findings support the trial court's conclusion that Abigail was a dependent juvenile.

## II.  Reunification

Respondent-mother argues that the trial court erred in ceasing reunification efforts with her and failing to make reunification part of Abigail's permanency plan. Her arguments are meritless.

"When a petition for termination of parental rights is filed in the same district in which there is pending an abuse, neglect, or dependency proceeding involving the same juvenile, the court on its own motion or motion of a party may consolidate the action pursuant to G.S. 1A-1, Rule 42." N.C.G.S. § 7B-1102(c) (2019). Under Rule 42, "when actions involving a common question of law or fact are pending in one division of the court, the judge may order a joint hearing or trial of any or all the matters in issue in the actions[.]" N.C.G.S. § 1A-1, Rule 42(a) (2019). Here, the juvenile neglect and dependency proceeding was pending when the motion to terminate respondent-mother's parental rights was filed. *See In re R.B.B.*, 187 N.C. App. 639, 644, 654 S.E.2d 514, 518, *disc. review denied*, 362 N.C. 235, 659 S.E.2d 738 (2007) (stating that "the juvenile code presents no obstacle to simultaneous hearings on an abuse, neglect, and dependency petition and a termination of parental rights petition.").

First, respondent-mother argues that she had no notice that the permanent plan would be one of the subjects of the consolidated adjudication and disposition and

termination of parental rights hearing. Yet, the record confirms that in a "Statutory Notice and Motion for Termination of Parental Rights", filed 29 August 2018 and sent to respondent-mother, she was notified that DSS was recommending the permanent plan be adoption. We also agree with the guardian *ad litem* that in a hearing where a parents' rights in their child are subject to termination, the parent has necessarily been informed that the child's permanent plan is at issue.

¶ 30     Next, respondent-mother argues that the trial court erred in ceasing reunification efforts and failing to make sufficient findings to support removing reunification from the permanent plan. N.C.G.S. § 7B-901(c) provides that

> (c) If the disposition order places a juvenile in the custody of a county department of social services, the court shall direct that reasonable efforts for reunification as defined in G.S. 7B-101 shall not be required if the court makes written findings of fact pertaining to any of the following, unless the court concludes that there is compelling evidence warranting continued reunification efforts:
>
> > (1) A court of competent jurisdiction determines or has determined that aggravated circumstances exist because the parent has committed or encouraged the commission of, or allowed the continuation of, any of the following upon the juvenile:
> >
> > . . . .
> >
> > > f. Any other act, practice, or conduct that increased the enormity or added to the injurious consequences of the abuse or neglect.

N.C.G.S. § 7B-901(c)(1) (2019).

¶ 31    Here, the trial court made the following findings in its disposition order:

> 3. Based upon the evidence presented in the adjudication phase of this case and the additional evidence presented in the disposition phase of this case, aggravating factors exist that prevent reunification with either parent in this matter in that [Abigail's] sibling died in the home due to abuse, and the mother and father have consistently worked together to conceal what happened to [Anna]. This conduct increases the enormity and adds to the consequences of the neglect of [Abigail] because there is no means by which this Court can address what caused the death of [Anna] and thereby [e]nsure the safety of [Abigail].
>
> 4. Any effort to reunify the parents with this juvenile would be clearly unsuccessful and inconsistent with the juvenile's health and safety and need for a safe, permanent home within a reasonable period of time.

¶ 32    Respondent-mother challenges finding of fact 3. She does not contest the finding that Anna died in the home due to abuse. Rather, she argues that there was no evidence presented that she worked with respondent-father to conceal what happened to Anna. As previously discussed, however, there is sufficient evidence in the record that respondents continued to provide an implausible explanation for Anna's injuries and death and worked together to conceal the truth. Under these circumstances—respondent-mother's failure to acknowledge that Anna died due to abuse, her involvement with respondent-father to conceal the truth, and her continuing romantic relationship with respondent-father —the trial court's finding that respondent-mother's conduct increased the enormity and added to the consequences of neglect is supported by the evidence. Therefore, the trial court

properly determined that reasonable efforts for reunification would be unsuccessful and inconsistent with Abigail's welfare.

¶ 33   Lastly, respondent-mother reiterates many of her prior arguments that the trial court should have placed Abigail in a kinship or nonrelative kinship placement. As previously discussed, however, the trial court appropriately declined to place Abigail in respondents' proposed alternative placements because not one of them believed Anna had been abused, and the trial court reasonably inferred that their failure to acknowledge the intentional nature of Anna's injuries and death would hinder their ability to provide a safe environment for Abigail.

### III.   Grounds for Termination

¶ 34   Respondent-mother argues that the trial court erred by adjudicating that grounds existed to terminate her parental rights. "Our Juvenile Code provides for a two-step process for termination of parental rights proceedings consisting of an adjudicatory stage and a dispositional stage." *In re Z.A.M.*, 374 N.C. 88, 94, 839 S.E.2d 792, 796–97 (2000) (citing N.C.G.S. §§ 7B-1109, 1110 (2019)). "At the adjudicatory stage, the petitioner bears the burden of proving by 'clear, cogent, and convincing evidence' the existence of one or more grounds for termination under section 7B-1111(a) of the General Statutes." *In re A.U.D.* 373 N.C. 3, 5–6, 832 S.E.2d 698, 700 (2019) (quoting N.C.G.S. § 7B-1109(f) (2019)). "A trial court's finding of fact that is supported by clear, cogent, and convincing evidence is deemed conclusive even

if the record contains evidence that would support a contrary finding." *In re B.O.A.*, 372 N.C. at 379, 831 S.E.2d at 310. Unchallenged findings are deemed to be supported by the evidence and are binding on appeal. *In re Z.L.W.*, 372 N.C. 432, 437, 831 S.E.2d 62, 65 (2019). "The trial court's conclusions of law are reviewable de novo on appeal." *In re C.B.C.*, 373 N.C. 16, 19, 832 S.E.2d 692, 695 (2019).

¶ 35 Here, the trial court determined that grounds existed to terminate respondent-mother's parental rights based on neglect and dependency. N.C.G.S. § 7B-1111(a)(1), (6) (2019). Because "an adjudication of any single ground for terminating a parent's rights under N.C.G.S. § 7B-1111(a) will suffice to support a termination order," we need only examine whether grounds existed to terminate respondent-mother's parental rights pursuant to N.C.G.S. § 7B-1111(a)(1). *In re J.S.*, 374 N.C. at 814–15, 845 S.E.2d at 70–71.

## Neglect

¶ 36 A trial court may terminate parental rights if it concludes the parent has neglected the juvenile within the meaning of N.C.G.S. § 7B-101. N.C.G.S. § 7B-1111(a)(1) (2019). In certain circumstances, the trial court may terminate a parent's rights based on neglect that is currently occurring at the time of the termination hearing. *See, e.g., In re K.C.T.*, 375 N.C. 592, 599–600, 850 S.E.2d 330, 336 (2020) ("[T]his Court has recognized that the neglect ground can support termination . . . if a parent is presently neglecting their child by abandonment."). However, for other

forms of neglect, the fact that "a child has not been in the custody of the parent for a significant period of time prior to the termination hearing" would make "requiring the petitioner in such circumstances to show that the child is currently neglected by the parent . . . impossible." *In re N.D.A.*, 373 N.C. 71, 80, 833 S.E.2d 768, 775 (2019) (cleaned up). In this situation, "evidence of neglect by a parent prior to losing custody of a child—including an adjudication of such neglect—is admissible in subsequent proceedings to terminate parental rights[,]" but "[t]he trial court must also consider any evidence of changed conditions in light of the evidence of prior neglect and the probability of a repetition of neglect." *In re Ballard*, 311 N.C. 708, 715, 319 S.E.2d 227, 231 (1984); *see also* N.C.G.S. § 7B-101(15) ("In determining whether a juvenile is a neglected juvenile, it is relevant whether that juvenile lives in a home where another juvenile has died as a result of suspected abuse or neglect[.]"). After weighing this evidence, the court may find the neglect ground if it concludes the evidence demonstrates "a likelihood of future neglect by the parent." *In re R.L.D.*, 375 N.C. 838, 841, 851 S.E.2d 17, 20 (2020). Thus, even in the absence of current neglect, the trial court may adjudicate neglect as a ground for termination based upon its consideration of any evidence of past neglect and its determination that there is a likelihood of future neglect if the child is returned to the parent. *Id.* at 838, 851 S.E.2d at 20 n.3.

¶ 37        In the present case, Abigail was not in respondent-mother's physical custody at the time of the termination hearing which began on 31 January 2019. DSS obtained nonsecure custody of Abigail on 16 March 2018, shortly after her birth. In terminating respondent-mother's parental rights, the trial court relied upon: the abuse and neglect of Anna while in respondents' care; respondent-mother's failure to provide a plausible explanation for Anna's injuries; respondents' coordination of their statements explaining Anna's injuries and their combined actions in concealing the truth about what happened to Anna; and respondent-mother's continued romantic relationship with respondent-father and her intent to deceive the court about their relationship. The trial court found that Anna's death in respondents' home and respondents' joint concealment of what caused Anna's injuries and death "increases the enormity and adds to the consequences of the neglect of [Abigail] because there is no means by which this Court can address what caused the death of [Anna] and thereby [e]nsure the safety of [Abigail]." The trial court further found that any efforts to reunify respondents with Abigail would be unsuccessful and inconsistent with Abigail's health, safety, and need for a safe, permanent home within a reasonable time, and found that there was a probability of abuse or a repetition of neglect in respondents' home. The trial court concluded that respondent-mother had neglected Abigail in that she created an environment injurious to Abigail's welfare and "there is no indication or evidence that the mother is willing or able to correct the

circumstances that lead to the death of [Anna] and the injurious environment of the juvenile."

¶ 38    Respondent-mother challenges multiple findings of fact made by the trial court as not being supported by the evidence. The trial court's findings of fact 7 through 40 in its termination order, however, are identical to the trial court's findings of fact 5 through 38 in its order adjudicating Abigail a neglected and dependent juvenile, and respondent-mother reasserts challenges to the same findings of fact that we have already addressed above.

¶ 39    Respondent-mother next argues that the findings of fact do not adequately support the trial court's conclusion that grounds had been proven to terminate her parental rights based on neglect. She asserts that the present case is distinguishable from *In re D.W.P.*, 373 N.C. 327, 838 S.E.2d 396 (2020).

¶ 40    In *In re D.W.P.*, this Court affirmed an order terminating a mother's parental rights on the basis of neglect. The mother's eleven-month-old son was treated for a broken femur and had numerous other factures that were in the process of healing. The mother attributed his fractured femur to the family's seventy-pound dog and suggested the children's biological father had inflicted the older injuries. *Id.* at 328, 838 S.E.2d at 399.  Based upon the boy's young age and multiple fractures for which the mother and her fiancé could provide no plausible explanation, the Guilford County Department of Health and Human Services (GCDHHS) filed a petition and

obtained nonsecure custody of both children. *Id.* at 328, 838 S.E.2d at 399. The trial court terminated the mother's parental rights, concluding that "her neglect continued, and . . . she was likely to neglect the children in the future." *Id.* at 329, 838 S.E.2d at 400. The trial court focused on the mother's refusal to honestly report how her son's injuries occurred and believed GCDHHS was unable to provide a plan to ensure that injuries would not occur in the future without knowing the cause of the injuries. *Id.* at 329, 838 S.E.2d at 400.

¶ 41    In affirming the trial court's conclusion that neglect was likely to reoccur if the children were returned to the mother's care, this Court noted in *D.W.P.* the troublesome nature of the mother's "continued failure to acknowledge the likely cause of [her son's] injuries." *Id.* at 339, 838 S.E.2d at 406. This Court also noted that despite the mother's recognition that her fiancé could have caused her son's injuries, she re-established a relationship with him that resulted in domestic violence and "refuse[d] to make a realistic attempt to understand how [her son] was injured or to acknowledge how her relationships affect her children's wellbeing." *Id.* at 340, 838 S.E.2d at 406.

¶ 42    Respondent-mother contends that respondent-father is incarcerated and does not pose a threat; that the historic injuries suffered by the son in *In re D.W.P.* were more extensive than those suffered by Anna; that respondent-mother was not criminally charged in relation to Anna's injuries like the mother in *In re D.W.P.*; and

that respondent-mother recognized that the respondent-father must not be allowed back in the home with Abigail.

Here, as in *In re D.W.P.*, respondent-mother failed to acknowledge the intentional nature of Anna's injuries, never provided a plausible explanation for Anna's injuries and resulting death, and continued to be in a romantic relationship with respondent-father with the intentions to remain together. In addition, DSS could not provide a plan to ensure that injuries would not occur in the future without respondent-mother's acknowledgement that Anna's death was not accidental. Accordingly, the trial court's conclusion, that neglect was likely to reoccur because there was no indication respondent-mother was willing or able to correct the circumstances that led to Anna's death or Abigail's injurious environment, is supported by the evidence and findings of fact.

Because the evidence supports the findings of fact and the findings of fact support at least one ground for termination of respondent-mother's parental rights, we need not address termination of respondent-mother's parental rights based on dependency. *In re B.O.A.*, 372 N.C. at 380, 831 S.E.2d at 311. Furthermore, respondent-mother does not contest the trial court's dispositional determination that it was in Abigail's best interests to terminate her parental rights. The trial court's order terminating respondent-mother's parental rights in Abigail is affirmed.

AFFIRMED.